JAMES REDDICK, ADMINISTRATOR OF THE ESTATE OF
JOSEPH PIMES, DECEASED,

*v.*

STATE OF ILLINOIS.

*Opinion filed January 1, 1909.*

1. MILITARY SERVICE—*claim for death while in.* This claim was originally brought by James Reddick, administrator of the estate of Joseph Pimes, deceased, on his own behalf and on behalf of the mother of said deceased. Reddick having died, John F. Devine was appointed in his place, and the brothers of said Joseph Pimes, deceased, were added as claimants.

2. NAVAL RESERVES—*commanding officer.* The captain of the Naval Reserves is its commanding officer under the Governor.

3. RULES AND REGULATIONS—*who makes.* The statutes authorize the Commander-in-Chief to make rules and regulations for the government of the military and naval forces of the State, which rules and regulations shall conform as nearly as practicable to the regulations of the Army and Navy of the United States.

4. FINANCIAL HELP OR ASSISTANCE—*defined.* "Financial help or assistance," as used in section 4 of article 11 of the Military and Naval Code of 1903, does not mean compensatory damages. It means a voluntary contribution on the part of the State in the nature of a pension.

6. CLAIMS—*how brought.* Claims of this character may be brought either in the name of the legal heirs directly, or in the name of the administrator for the use of the legal heirs. (*Witte* v. *State*, 1 Ct. of Cl. Rep., 249.)

Wm. Pettis and Robt. C. Busse, (Geo. E. Dawson, of Counsel) for Claimant.

W. H. Stead, Attorney General, and Chas. E. Woodward, Assistant Attorney General, (Roy Wright, of Counsel) for State.

This is a claim originally made against the State of Illinois by James Reddick, administrator of the estate of Joseph Pimes, deceased, on his own behalf as administrator, and on behalf of Celia Pimes, the surviving mother of deceased, alleged in the petition to be his only heir. It is stipulated that John F. Devine is the duly appointed successor of said James Reddick, now deceased. By amendment of the claim, Marx,

Selig, Henry and David Pimes, brothers of deceased Joseph Pimes, are added as claimants; and the proof shows that deceased died unmarried, leaving the mother and said brothers the sole surviving heirs of deceased.

The claim is brought under section four (4), article eleven (11), of the Illinois Military and Naval Code of 1903, being section 93, chapter 129, revised statutes 1908, which section of the statute is as follows:

"Section 93.—When killed or wounded in service.— Claim against State.] 4. In every case where an officer, soldier or seaman of the Illinois National Guard or the Naval Reserve of Illinois shall be killed or wounded while performing his duty as an officer, soldier or seaman in pursuance of lawful orders from the Commander-in-Chief, said officer, soldier or seaman, or his legal heirs, shall have a claim against the State for financial help or assistance, and the State Board of Claims shall act on and adjust the same as the merits of each case may demand."

The deceased in his lifetime and at the time of his death was a duly enlisted seaman of the First Division of the State Naval Reserves, a branch of the State Militia, located and with headquarters at Chicago. At the time of the death of deceased, Captain Warren F. Purdy was commanding officer (under the Governor) of the Naval Reserves; Lieutenant Cecil Page was commanding officer of said First Division. For some months previous hereto, and at the time of the death of deceased, Thomas Peter Coffee was Acting Coxswain in said First Division. Said First Division has its headquarters at No. 20 Michigan Avenue and its boathouse near the Randolph street viaduct.

On Thursday evening, July 5, 1906, deceased with five other more or less inexperienced seamen of said First Division, under the immediate command of Coxswain Coffee, were at boat drill on the lake. The boat was of the rowboat pattern in use in the Navy, four seated, with a capacity of ten or twelve persons;

fitted for sails, and termed in nautical parlance a "Dingy." The crew had rowed from the boathouse to near the mouth of the Chicago River, and shortly after 9 p. m. were returning to the boathouse under sail, when the boat capsized and deceased and four of his comrades were drowned, viz: Antonio Capodice, Edward M. O'Carroll, Ralph Heeg, and Robert E. Schrom; Coxswain Coffee and Seaman Frank Randall being the only survivors of the accident.

The Attorney General, on behalf of the State, files what amounts to a plea of the general issue and the main contention in the case is as to whether the deceased was killed "while performing his duty as a seaman in pursuance of lawful orders from the Commander-in-Chief", within the meaning of the statute in that behalf. Claimant's petition charges the State and its officers with negligence in not providing the boat with life preservers and other safety appliances, etc., but this position is abandoned on the hearing, and the right to recovery is based solely on death due to accident in performance of military duty in pursuance of lawful orders. On the other hand the State contends that in participating in "sailing" deceased was not in performance of his duties under lawful orders, and also that the proof fails to show that the deceased was himself free from contributory negligence.

The solution of the question at issue depends largely upon the orders under which deceased was serving when drowned and the duties, authority and discretion of the various officers over him.

The Captain of the Naval Reserves is its commanding officer, under the Governor. The statutes authorize the Commander-in-Chief to make rules and regulations for the government of military and naval forces of the State, but provide that such rules and regulations shall conform as nearly as practicable to the regulations for the Army and Navy of the United States, and that when otherwise not provided, the rules and regulations of the United States shall govern,

(chapter 129, Revised Statutes). The law of the State makes provision for an annual cruise of the Naval Reserves; and for thirty drills per year as a minimum, to be weekly or semi-weekly, (Chapter 129, Ibid). The laws and regulations for the Illinois National Guard, embracing the Naval Reserves, make like provisions; they strictly enjoin obedience to orders, but do not contain special directions for drill nor undertake to particularize the duties of the various officers.

The United States Navy regulations provide that apprentices shall be carefully taught to pull, sail, steer, hook on and handle boats in all conditions of weather. Blue Jackets Manual, a semi-official publication in use by the United States Naval department and Illinois Naval reserves, makes it the duty of the coxswain to instruct the crew in the principles of handling a boat under oars and *sail* at every opportunity.

The evidence shows that on March 10, 1906, a general order was issued by the Commander-in-Chief, for the annual cruise of the First Division on the United States Steamship Dorothea from August 18 to 25. By virtue of this general order preparatory weekly drills were necessary and ordered by the captain, and by his direction Lieutenant Page, commanding the Division, by order dated June 15, 1906, ordered deceased to report for duty and drill once a week. About 8 p. m. July 5, regular drill night, deceased, with his comrades, reported for duty.

Lieutenant Page commanding, ordered Coxswain Coffee to take deceased and his comrades and give them drill with the boat. No directions were given as to whether the drill should be in rowing or sailing; no directions had been given against sailing. Coxswain Coffee took his men as directed, proceeded from headquarters to the boathouse, launched the boat and proceeded to drill the men in rowing the boat from the boat house to near the mouth of the river. On the return, some of the crew suggested that they sail back. The coxswain acquiesced in this suggestion and or-

dered the sail hoisted, and they sailed toward the boat house, under the guidance and command of the coxswain. The evidence is quite meagre as to the details of the accident, but does show that quite a stiff breeze was blowing and that when the boat got opposite a gap in the breakwater opposite the foot of Van Buren street, through which the waves were running high, the coxswain undertook to "tack" and capsized the boat. Deceased and the entire crew were thrown into the water, and deceased and four of his comrades were drowned.

We are clearly of the opinion that deceased was at the time performing his duty pursuant to lawful orders of his Commander-in-Chief. The order for drilling had been properly transmitted down the line from the Commander-in-Chief. It was within the authority, indeed, was the duty of the coxswain to drill the recruits in sailing. The boat was equipped for sailing. It had been used for that purpose. It is true no express order had eminated from higher authority than the coxswain, to drill with sails, but no such order was necessary; it was his duty to so drill them, and it was clearly within his authority and discretion to determine the time and manner to so drill them. Not only does this appear from the Army and Navy Regulations above quoted, but Coxswain Coffee himself on the witness stand testified: "It was the usual custom to have rowing and *sailing* given at all times. First, instructions were given in rowing and then in sailing afterwards," and when asked "In whose discretion was it as to which manner or method the drills should be adopted?" answered, "The party in charge of the boat." "Which would be the coxswain." Answer, "Yes sir." And Lieutenant Page commanding, when asked, "Has the coxswain discretion after receiving such an order as you gave him that night as to what will or shall be done in the course of his duties?" answered, "Yes sir." It is very manifest from an inspection of the Naval regulations, pertaining to the

duties of the coxswain and seaman, as well as from a consideration of the oral evidence, that it was clearly within the discretion of the coxswain, acting under his orders, to order and engage in drill with sails. He gave such order and in the drill deceased lost his life. It is argued by the State that because the suggestion for such drill came from some member of the crew, the State is thereby in some way relieved of liability. We fail to appreciate how the source of the suggestion can make a particle of difference. In the first place it is not shown that the suggestion came from the deceased; but it would make no difference if it did. The giving of the order was within the authority and discretion of the coxswain, and he gave it; and it does not make a particle of difference where he got the suggestion.

It is also urged that it is not shown but what deceased was guilty of contributory negligence. It is not necessary to decide whether such question is involved under the statute in question, as we think it is fairly shown by the evidence that deceased's death was in no way due to any contributory negligence on his part. The evidence clearly shows that the boat was capsized in turning under the management of the coxswain, the man at the helm; and was in no way due to any act or omission on the part of the deceased.

We are therefore of the opinion that deceased was killed "while performing his duty as a * * * seaman pursuant of lawful orders from his Commander-in-Chief"; and that his legal heirs have a claim against the State for financial help and assistance, within the meaning of the statute.

It is urged by claimant that the meaning of this statute is that compensatory damages should be allowed, and in view of that contention much evidence has been adduced by claimant, as to the earning capacity of deceased, dependency of the heirs, etc. In the view we take of the meaning of this statute it will be unnecessary to discuss this evidence at length. We do

not think the language or purpose of the statute capable of the construction placed upon it by claimant.

Financial help and assistance does not mean compensatory damages. It means a voluntary contribution on the part of the State, in the nature of a pension, and imposes the duty on this Court to determine the amount. We have no doubt that deceased was a most worthy young man, of good habits, fair education, good earning powers, and that his mother and brothers suffered a great loss in his most unfortunate death, and in arriving at our award we do not desire to be understood as fixing an amount that we deem full compensation to them for their loss. Acting on the purpose and spirit, as well as the letter of the law, as we understand it, and keeping in view the precedents of this Court, as well as taking into consideration the needs of the heirs of deceased for "financial help and assistance" we award claimant the sum of two thousand ($2,000.00) dollars.

It is suggested by the State that on the authority of the case of *Witte* v. *State,* 1 Ct. of Cl., 249, this proceeding should be on behalf of the legal heirs of the deceased and not by the administrator. We are of the opinion that the proceeding should be, and is, on behalf of the legal heirs of deceased; but we held in the above case that it was proper for the action to be brought by the administrator for the use of the legal heirs, and we adhere to that holding; the proceeds of the award not to go into the general assets of the estate, but to go solely to the heirs, to be distributed by the Court having jurisdiction of the estate, in accordance with law.

We, therefore, award claimant, John F. Devine, administrator of the estate of Joseph Pimes, deceased, for the sole use and benefit of the legal heirs of the deceased, Joseph Pimes, the sum of two thousand ($2,000.00) dollars.